IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| **FRED KARNES AND JANET KARNES** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:16-CV-04309-MDH** |
| | ) | |
| **HAPPY TRAILS RV PARK, LLC,** | ) | |
| **HAPPY TRAILS RV CENTER, LLC,** | ) | |
| **CAROL A. KUCSIK, and** | ) | |
| **DANIEL R. KUCSIK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Before the Court is Plaintiff's Motion for Partial Summary Judgment. (Doc. 111). Plaintiffs are Fred and Janet Karnes, and Defendants are Daniel and Carol Kucsik, RV Center, LLC, and Happy Trails RV Park, LLC. The Court has previously granted Defendant RV Center's Motion for Summary Judgment and dismissed all claims against it by Janet Karnes. (Doc. 133). As such, Daniel Kucsik, Carol Kucsik, and the RV Park are the only remaining defendants to claims made by Janet Karnes. Fred and Janet Karnes have made four claims against Defendants, for (1) violations of the overtime provisions of the Fair Labor Standards Act (FLSA); (2) violations of minimum wage provisions of the FLSA; (3) violations of the overtime provisions of the Missouri Wage and Hour Law (MWHL); and (4) violations of the minimum wage provisions of the MWHL. (Doc. 36).

Plaintiffs ask the Court to enter summary judgment finding that they were employees of Defendants, that Defendants are liable to them under the FLSA and MWHL for unpaid overtime and minimum wage violations, and that no FLSA exemptions apply to the instant case. They ask

1

for back pay, liquidated damages, reasonable attorney's fees, and for a finding that Defendants' violations of the FLSA and MWHL were willful.

For the reasons explained below, the Court finds that Plaintiffs were employees of the remaining Defendants and further finds that no FLSA exemptions apply to them. The Court, however, will deny Plaintiffs summary judgment on the issue of Defendants' liability under the FLSA and MWHL due to factual disputes regarding the number of hours worked by Plaintiffs and whether those hours were sufficient to entitle Plaintiffs to overtime and minimum wage back pay. The Court also declines to enter summary judgment on the issue of whether Defendants' FLSA and MWHL violations were willful because there are genuine factual disputes regarding Defendants' knowledge of the alleged violations. A trial on those issues will be scheduled.

## Background

Defendants Daniel and Carol Kucsik, who are married, jointly own Happy Trails RV Park, LLC ("RV Park"). Happy Trails RV Park is an RV Park located adjacent to Interstate 44, about five miles southwest of Lebanon, Missouri. The park has a lake for fishing, a pool, a game room, a camp store, and a campground for people with RVs. It is located adjacent to the Happy Trails RV Center, also owned jointly by Daniel and Carol Kucsik, a full-service RV shop that sells, rents, and provides services for RVs. Daniel and Carol Kucsik kept their office at the RV Center. Between 85% of the RV Park's business came from renting lots to customers who came to the camp in their RVs. Most campers only stayed for a night or two, although some would settle down for a period of months. The RV Park also made money by selling supplies and propane at the camp store.

Daniel and Carol Kucsik did not manage the day-to-day operation of the Park. In 2010, after a single interview where both Daniel and Carol Kucsik were present, they hired Fred and

Janet Karnes, who are married, to manage the RV Park. Fred Karnes and Janet Karnes signed a Park Manager Agreement ("Agreement") between themselves and Daniel Kucsik, acting in his capacity as a co-owner of the RV Park. Fred and Janet Karnes entered into new Agreements in 2013, 2014, 2015, and 2016. These contracts are substantively similar, outside of changes in pay terms and modifications regarding the hiring of other workers and leave policies.

The Park Manager Agreement detailed the duties and compensation of the park managers. Between 2010 and 2013, Fred and Janet Karnes earned a salary of $365.00 a week, split between them. From 2014 to 2016, their joint salary increased to $450.00. Between 2010 and 2013, they received a "bonus" of $3.00 for every campsite rented per day, and $25.00 for every monthly site rental. From 2013 to 2016, they continued to receive the $3.00 bonus for every campsite rented per day, but received more for monthly rentals contingent on the number of monthly rentals made, with a maximum payment of $30.00 per monthly rental. These bonus amounts would be paid out jointly to the Karnes every month. Plaintiffs made significantly more money from the daily site rentals than from the monthly site rentals. The RV Park typically made between two and five monthly rentals each month between 2010 and 2016.

In addition to the salary and site rental bonuses, Plaintiffs also received as a monthly bonus five percent of the proceeds from store and propane sales, although these commissions were dwarfed by the site rental bonus amounts. The total monthly bonus amounts received from all sources ranged from as low as $74.99 to as high as $1288.63. As part of their compensation, Plaintiffs were also allowed to live in a mobile home at the Park provisioned with phone service, internet access, water, reimbursement for two gas fill-ups a month, and permission to use the park facilities. The Karnes paid their own electricity bills.

3

The Agreement listed the duties of the Park Managers. Per the Agreement, the Park Managers were obligated to ensure 24/7 on-site supervision of the park, and ensure that campers paid their fees. They were obligated to provide a schedule of days off and note who would cover the park during their absence. They were obligated to maintain store hours "appropriate to the season," take reservations, and respond to calls in a timely manner. They were obligated to assist each customer in finding a site and ensuring they were satisfied with the site. They were obligated to maintain the park, which included cleaning the bathrooms multiple times per day, cleaning the pool, and ensuring that the park grounds and park equipment were maintained. They were obligated to count and reconcile the cash register each day, as well as deliver the coins in the laundry facilities to the owners. Finally, they were obligated to gain the approval of the owners before making any modifications to the park facilities. When buying supplies for the park, the managers used a company credit card. With the exception of some small tools that belonged to Fred Karnes, the Karnes' vehicle, and their cell phones, every piece of equipment used to perform their job belonged to the park owners. This equipment included mowers, trimmers, a computer, a cash register, a golf cart, pool supplies, and cleaning supplies. Carol Kucsik also personally provided a four-wheeler for Plaintiffs. The parties are unclear on whether Fred and Janet Karnes were provided with workers' compensation insurance, although other park laborers were provided with insurance.

The Agreement's terms gave the owners substantial control over the managers. Any use of the park that was "other than intended" required prior written approval of the owners. The owners had to approve of all monthly site rentals, as well as all days taken off. Beginning in 2015, the park managers per the Agreement needed permission from the owners to hire any park workers, although the record indicates that they generally sought owner approval before 2015, as well.

4

Finally, the owners were entitled to fire the park managers immediately and without cause. The park managers, if they wanted to quit, had to give two weeks' notice.

The park owners set the prices for campsite rentals and store items. They were also in charge of advertising, although Janet Karnes at one point did post an advertisement for the park on some free websites. The park owners drafted the Park Manager Agreement. The park managers did not keep employment records for Fred and Janet Karnes other than keeping copies of the Park Manager Agreement. This is in contrast to other workers at the park, who did have employment records kept for at least the duration of their employment.

In practice, Fred and Janet Karnes split duties in the park. Fred was the maintenance man, responsible for maintaining the appearance and functionality of the park. He spent most of his day outside. Janet, by contrast, spent most of her day inside the park store, performing bookkeeping, helping customers who came into the store buy goods or rent campsites, and submitting the green sheets to the owners that contained the ledger of that day's financial transactions. Fred had prior experience as a mechanic and cable technician, and upon starting didn't receive specific training other than being told what the expectations were in terms of park upkeep. Janet had experience as a cashier, office worker, and as the owner of a small store, and upon starting did receive instructions from Carol Kucsik on how to do the necessary bookkeeping. Both Fred and Janet Karnes were responsible for cleaning different parts of the park, different restrooms, and for maintaining the pool. At the beginning of their employment, a campground consultant showed Fred and Janet Karnes how to run the campground.

On a day-to-day basis, Fred and Janet Karnes had wide latitude to do their jobs as they saw fit. They were not given set work schedules, told when their days started and ended, or directed on how to complete tasks when they were assigned. Fred Karnes and Dan Kucsik would confer most

mornings to go over what Fred should accomplish that day. Fred Karnes did seek permission from Dan Kucsik before completing any major projects, but on smaller projects had the ability to identify and complete a job without outside input. Janet Karnes was mainly supervised by Carol Kucsik, and it was Carol who would review the green sheets completed by Janet for discrepancies and, when needed, work with Janet to fix those discrepancies. Janet Karnes also sold small trinkets of her own making in the store. Fred and Janet Karnes had a yearly meeting with Dan Kucsik to discuss their employment and other park issues. Carol Kucsik cannot recall if she attended this meeting.

Fred and Janet Karnes were not the only workers at the park. Between 2010 and 2016, there were a handful of other park workers who performed a variety of duties that usually would belong to both Fred and Janet Karnes. These workers were usually recruited by Fred and Janet Karnes but were ultimately hired and paid by the RV Park itself. The owners also had the ultimate authority to dismiss the other camp workers.

<u>**Standard of Review**</u>

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

## Discussion

Plaintiffs move for summary judgment on four issues: (1) that they were Defendants' employees under the FLSA and MWHL; (2) that they are entitled to summary judgment against Defendants on minimum wage and unpaid overtime liability under the FLSA and MWHL; (3) that Defendants' violations were willful and thus the statute of limitations should be extended from two to three years; and (4) that none of the relevant FLSA exemptions excuse Defendants' failure to pay overtime. The Court will address these issues in turn.

## I. Employees Under the FLSA and MWHL

The MWHL is generally interpreted in accordance with the FLSA, and for the purposes of this order, the Court will treat Plaintiffs' FLSA claims and MWHL claims as if they were the same. RSMo. § 290.505(4) ("Except as may be otherwise provided . . . this section shall be interpreted in accordance with the Fair Labor Standards Act[.]"). In order to bring a minimum wage or overtime claim against an employer under the FLSA, a plaintiff must be an employee of the Defendant. *Childress v. Ozark Delivery of Missouri, LLC*, 95 F. Supp. 3d 1130, 1138 (W.D. Mo.

2015). The determination of whether an employee-employer relationship exists is typically a question of law for the court to decide, although the burden rests on the employee. *Donovan v. Trans World Airlines, Inc.*, 726 F.2d 415, 417 (8th Cir. 1984); See also *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993).

An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA enables claims against individual supervisors as well as corporate employers. *Id.* The remedial purpose of the statute requires the Court to define "employer" more broadly than the term would be interpreted under traditional common law principles of agency. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); *Donovan v. Tony & Susan Alamo Found.*, 722 F.2d 397, 400, n. 8 (8th Cir. 1983). In addition, the FLSA contemplates situations where an employee has several simultaneous employers, each responsible for compliance with the FLSA. *Falk v. Brennan*, 414 U.S. 190, 195. (1973).

The Eighth Circuit in *Karlson* v. *Action Process Service & Private Investigations, LLC* articulated the six guiding factors to be considered when determining the existence of an employee-employer relationship. 860 F.3d 1089, 1093 (8th Cir. 2017). They are: (1) the degree of control exercised by the alleged employer over the business operations; (2) the relative investments of the alleged employer and employee; (3) the degree to which the employee's opportunity for profit and loss is determined by the employer; (4) the skill and initiative required in performing the job; (5) the permanency of the relationship; and (6) the degree to which the alleged employee's tasks are integral to the employer's business. *Id.* (citing *U.S. v. Silk*, 331 U.S. 704 (1947)). The Court is mindful that these six factors are only a guide, and that it is ultimately an assessment of the

economic reality of the situation at bar, and not any technical concept, that will determine its decision. *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961). The Court will assess the six *Karlson* factors in turn.

As a preliminary matter, the contracts between Plaintiffs and RV Park state that they should not be construed as employment agreements. This type of labeling, by itself, is not sufficient to establish a genuine issue of material fact as to the nature of parties' relationship. Instead, the Court will look to the content of the agreement and the course of conduct between the parties, using the six *Karlson* factors as a guide.

### a. The Six Factors

### 1. Degree of Control Exercised by Defendants

` The Park Manager Agreement ("Agreement") gave Defendants a high degree of control over Plaintiffs. By its own terms, the RV Park could fire Plaintiffs at will. The use of the RV Park facilities was limited to what was allowed by the RV Park. Defendants could only take vacation days between March 1 and October 1 with the permission of the Kucsiks, and had to provide a list of off-days to the Kucsiks on a monthly basis, subject to their approval. Maintaining the appearance of the park, a responsibility of the Defendants, was subject to the Kucsiks' approval. All monthly rentals, as well as all modifications or additions to the facilities, also had to be approved by the Kucsiks. Under the agreement, the Karnes were obligated to notify the Kucsiks whenever an out-of-balance situation occurred at the cash register. Finally, the Kucsiks had to approve of all workers hired by the park.

Defendants claim there is a genuine issue of material fact as to the degree control they exercised over Plaintiffs. Defendants cite to the fact that Plaintiffs were not told when, where, or how to complete tasks, when the workday ended, how much work to perform in a day, or how to

9

perform any specific services. They point out that Plaintiffs' time was not tracked, that they were not provided every tool necessary to do their jobs, and did not receive meaningful job training. They also claim it is disputed whether and to what extent Plaintiffs were possessed of managerial authority, including the authority to hire and fire other workers, determine store hours, and advertise. Finally, they point to instances where Plaintiffs' conduct seems to run against the terms of the Agreement—for example, times when Plaintiffs' took time off without seeking permission from the owners.

Upon its own review of the record, the Court agrees with Defendants that the terms of control outlined in the agreement did not always reflect the facts on the ground. As a matter of day-to-day practice, Fred and Janet Karnes seemed to possess substantial leeway in regard to their work schedules and how they proceeded through their assigned tasks. They were not "on the clock," although Fred Karnes and Daniel Kucsik did meet most mornings to discuss park business and what needed to be done that day. Fred Kucsik, who had the responsibility of maintaining the appearance of the park, was obligated to submit a list to Daniel Kucsik of his proposed fixes, and could only proceed on items after Daniel Kucsik approved. Janet Karnes, likewise, was obligated to submit green sheets to Carol Kucsik, who would review and approve them at her own discretion.

The general pattern of conduct between the Kucsiks and the Karnes between 2010 and 2016 reflects a relationship that left little doubt as to who was ultimately in charge of the park. The Kucsiks, although they ruled with a light hand in many instances, indisputably understood themselves to be possessed of the power to control the actions of the Karnes and the activity in the park that they owned. The undisputed record leaves no real doubt that the Karnes shared the Kucsiks' understanding on this point. The Kucsiks, as a matter of practice, decided whether to hire and fire park workers. They decided what maintenance projects would be completed and when,

even if they left the "how" to the handyman and former mechanic Fred Karnes. They set all the prices, and the Court notes that the undisputed testimony of Janet Karnes indicates that, at least in one case, Daniel and Carol Kucsik decided together to raise prices for a water and electric hook-up at each campsite. They gave a company credit card to the Karnes to make business-related purchases, leaving no question as to which party was financially on the hook. Carol Kucsik decided how bookkeeping would be performed, trained Janet Karnes, and gave directions to Fred Karnes concerning the cleaning of the park. They generally decided what days the Karnes would be expected to work and what days they would be allowed off, even if this power was lightly exercised and occasionally relinquished.

Defendants point out that their relationship with Plaintiffs carried none of the customary trappings of an employer-employee relationship. The Court disagrees. Employees customarily request time off in advance, receivie a weekly salary with bonuses on commission, and use a company credit card when transacting company business. However, the Court understands and agrees that the arrangement between the parties was unorthodox, and, frankly, defies the normal rubric used to determine the degree of control an alleged employer exercised over an alleged employee. Generally, an independent contractor is one who contracts to perform work "according to his own methods without being subject to the control of his employer except as to the result of his work." *Thornton v. Mainline Communications, LLC*, 157 F.Supp.3d 844, 849-49 (E.D. Mo. 2016) (quoting *Howard v. City of Kansas City*, 332 S.W.3d 772, 782 (Mo. banc 2011).

At first blush, this seems to fit the instant scenario—the record is clear that although the Kucsiks directed the Karnes as to their duties and tasks, they did not generally control the manner in which the work was done. However, there are many instances where the Kucsiks *did* control the manner of Plaintiffs work. For example, Carol Kucsik did instruct Janet Karnes on how to do the

bookkeeping. And Daniel Kucsik did, in fact, instruct Plaintiffs on how to lead customers to their designated camp site and confer regularly with Fred Karnes on work that needed to be done. More importantly, the Court, after careful consideration of the record, finds that Plaintiffs were at all times subject to the control of Defendants, even if that control was exercised sparingly in many instances. The Court will not mistake an alleged employer who truly lacked control over the manner in which its employees performed their job with an alleged employer who possessed, and chose in some instances to delegate, that control. Defendants point toward the many occasions in the record where the Kucsiks made a decision regarding the park without first gaining their assent as proof that there is a genuine issue of material fact as to whether Defendants exercised control over Plaintiffs. However, rather than demonstrating the lack of control Defendants exercised over Plaintiffs, the Court views these instances as evidence establishing that Defendants trusted the Karnes, and felt comfortable relying on their experience and familiarity with the park. The Court considers this factor to cut in favor of Plaintiffs.

### 2. Relative Investments of Employer and Employee

The record is undisputed that Plaintiffs mainly used materials provided by Defendants in the performance of their jobs. Defendants provided for Plaintiffs a lawn mower, trimmers, a computer, a golf cart, pool supplies, a cash register, and a garage to store equipment in. Carol Kucsik also personally provided a four-wheeler for Plaintiffs use. They also provided complimentary on-site housing to Plaintiffs, which is an investment in the business to the extent that its purpose was to provide better service by enabling the park managers to live close to the campers. Lastly, Defendants provided a company credit card and gasoline reimbursements to Plaintiffs. Plaintiff Fed Karnes, for his part, brought basic hand tools to the job, including a screwdriver and a few wrenches. The Karnes also sometimes used their car to perform job duties,

although Defendants provided a gas reimbursement for its use. It is clear from the undisputed record that Defendants investment in the equipment and materials needed to manage the park dwarfed the investment of Plaintiffs, and consequently the Court considers this factor to cut in favor of Plaintiffs.

### 3. Degree To Which Employees' Opportunity for Profit is Determined by Employer

Plaintiffs claim that Defendants solely determined their opportunity for profit and loss. Defendants dispute this on the basis that part of Plaintiffs' compensation was derived from renting campsites and from store and propane sales, and that there is a genuine issue of material fact as to whether Plaintiffs had the opportunity to operate their own business while employed by the RV Park.

On its own review of the record, the Court is unconvinced by Defendants' contentions. While it is true that Plaintiffs did stand to earn more by renting more campsites and increasing store sales, it is not genuinely disputed that every monthly rental was subject to approval by Defendants, giving Defendants control over the opportunity for Plaintiffs to make more money. Furthermore, the record contains only two pieces of evidence indicating that Plaintiffs had opportunity to increase their profit. First, Janet Karnes sold items of her own making in the park store and kept the proceeds from those sales. Second, on a few occasions, she advertised the RV Park on Craigslist and another camping website. Advertising was, in general, handled by Defendants. The Court considers these facts to have minimal bearing on whether Plaintiffs determined their own profit. Plaintiffs' primary opportunity to increase their own profit came by trying to provide an experience that would induce customers to return to the park. Yet the quality of a customer's experience was mainly determined by Defendants, who set the price of campsite rentals and store items, advertised the park, and approved any major maintenance requests made

by Plaintiffs. The record is clear that Plaintiffs' influence on the business fortunes of the RV Park paled against Defendants' influence.

After careful consideration of the undisputed record, including Janet Karnes' limited online advertising and trinket sales, the Court disagrees with Plaintiffs' argument that Defendants "solely" determined their opportunity for profit and loss. However, the Court does find that Defendants exercised a high degree of control over Plaintiffs' opportunity for profit. Consequrntly , the Court finds that this factor cuts in favor of Plaintiffs.

### 4. Skill and Initiative Required To Perform the Job

Plaintiffs state that the park manager positions did not require them to possess any special skills or expertise. Defendants claim that there is a genuine issue of material fact on this matter because Fred Karnes possessed sophisticated mechanical skills that he utilized to maintain the park, while Janet had prior management and recordkeeping experience that she utilized at the park.

The Court notes that when Daniel Kucsik was asked whether Janet Karnes had any special skills that she needed to do the job, he replied "no." Upon its own review of the record, the Court agrees with Carol Kucsik. Janet Karnes had general office skills and some basic familiarity with recordkeeping, but nothing that rises to the level of "specialized" in regard to the operation of an RV Park. Notably, she had to be trained by Carol Kucsik when she began work behind the desk at the park. The Court also notes that according to the undisputed testimony of Janet Karnes, a campground consultant hired by the RV Park showed Plaintiffs how to run the campground at the beginning of their employment.

The Court similarly notes that when Daniel Kucsik was asked whether Fred Karnes had any special skills that he needed to do his job, he replied "no." Fred Karnes, for his part, was previously a mechanic and had experience in maintenance and repair. However, according to the

14

undisputed testimony of Daniel Kucsik, Fred Karnes' mechanical skills were not required for him to perform his duties. The Court on this basis finds there to be no genuine issue of material fact as to whether the job of park manager required specialized skills and finds that this factor cuts in favor of Plaintiffs.

### 5. Permanency of the Relationship

Plaintiffs state that the permanency of the relationship between them and Defendants is strong evidence that they were employees, not independent contractors. Defendants claim there is a genuine issue of material fact on this issue on the basis that their relationship, although indefinite, was not exclusive. On its own review of the record, the Court agrees with parties that the relationship was indefinite in the sense that when it was entered into, there was no set time at which it would expire. As to Defendants' argument, the Court notes that whether or not a relationship is exclusive has little to do with whether it is permanent. An employee is capable of maintaining multiple permanent jobs concurrently. In this case, where Plaintiffs had a six-year open-ended business relationship with Defendants, and where there is no evidence that Plaintiffs had any business relationship with anyone else during that period, it is clear to the Court that there is no genuine issue of material fact as to whether Plaintiffs and Defendants had a permanent relationship. The Court finds this issue to cut in favor of Plaintiffs.

### 6. Importance of Plaintiffs to Defendants' Business

Plaintiffs state that the importance of their work to the operation of Defendants business is a factor in favor of finding that they were Defendants employees. Defendants claim that even though it is true the park manager position was certainly important to the park's operation, there is nonetheless a genuine issue of material fact as to whether Plaintiffs personal performance of

15

their job duties was critical. Defendants cite the fact that RV Park operated in Plaintiffs absence as evidence illustrating that there exists a genuine question on this issue.

After careful consideration of the record, the Court does not consider it genuinely disputed whether Plaintiffs were important to Defendants' business. According to Carol Kucsik's undisputed testimony, the RV Park could not operate without managers, a position filled jointly by Fred and Janet Karnes for six years. Daniel Kucsik in his own testimony confirmed that the park managers were critical to the operation of the park. The fact that the RV Park operated temporarily in Plaintiffs' absence, or that Plaintiffs theoretically had the ability to recruit other workers to perform some of those critical duties, is of no moment. The Court finds this factor to cut strongly in favor of Plaintiffs.

### b. Economic Realities

For the reasons explained above, every factor used by the Eighth Circuit weighs in favor of a finding that Plaintiffs were employees of Defendants, not independent contractors. The Court is mindful that the six factors are only a guide, and that ultimately the Court must assess the economic reality of the parties' situation. After careful consideration of the entire record, including the text of the Park Manager Agreement but also the conduct of each party, the Court is satisfied that the *Karlson* factors have led it to the correct result. The economic reality of the situation is that Plaintiffs, for the purposes of their work at the RV Park, were controlled by Defendants. That Defendants decided to take a hands-off approach toward the Karnes, leaving them in many cases to determine for themselves how to operate the RV Park, does not change the underlying reality that Plaintiffs were obligated to comply with Defendants directives in order to maintain their livelihoods and, indeed, their very living quarters. The Kucsiks' hands-off approach reflects a conscious decision to delegate the operation of the park to Fred and Janet Karnes, but the

16

undisputed record is clear that the power to control the park's operation, including the actions of its managers, was delegated but never truly relinquished. For this reason, the Court does not consider there to be a genuine issue of material fact as to whether Plaintiffs were employees of Defendants and will grant Plaintiffs' summary judgment motion on this issue.

## II. Liability for Minimum Wage and Overtime Violations

### a. Minimum Wage Provisions

Under the FLSA, every employer shall pay to each employee wages at the rate of $7.25 an hour**.** 29 U.S.C. § 206(a)(1). Under the Missouri Wage and Hour Law, every employer was obligated to pay to each employee wages at the rate of $7.65 an hour from 2015 to 2016, $7.50 an hour in 2014, and $7.35 in 2013. RSMo. § 290.502; *See* Missouri Department of Labor and Industrial Relations, *Minimum Wage,* at https://labor.mo.gov/DLS/MinimumWage. It is the employer's responsibility, not the employee's, to maintain employment records, including records of wages and hours worked. 29 U.S.C. § 211(c); *see also* 29 C.F.R. § 516.2. Plaintiffs move for summary judgment on violations of the FLSA and MWHL, claiming that the undisputed record shows that Defendants did not meet their minimum wage obligations. Defendants argue there are genuine issue of material fact that precludes summary judgment because it is disputed how many hours Plaintiffs worked and what their compensation was.

It is undisputed that Plaintiffs jointly earned $385 a week from 2010 to 2012 and $450 a week from 2013 to 2016, in addition to monthly bonuses that varied based on the number of campsites rented. They were also compensated the use of a trailer to live in, although whether that can be considered part of a wage under the FLSA is disputed.

In order to determine whether a minimum wage violation occurred, it is necessary to know two pieces of information: The amount an employee was paid over any given period, and the

number of hours they worked in that same period. Without both of these data points, it is impossible to calculate whether an employee's rate of pay met or fell below the minimum wage.

The Court's calculation in this case is frustrated by the lack of records documenting how many hours Plaintiffs worked in any given week or month. In lieu of records, the Court is left with deposition testimony from both parties. Daniel Kucsik at one point testified that during the busy season the park store was open and receiving customers from about 9:30 A.M. to 6:00 P.M. seven days a week, although it is not known for how much of this time the park was staffed by the Karnes versus other camp workers. During the slow season, the store was open only when the Karnes wanted to open it. Fred Karnes, on the other hand, testified that even during the slow season they were not allowed to completely close, and that the park hours were set by the Kucsiks. Carol Kucsik, for her part, testified that the park only needed to be open on an "as needed" basis, and that Fred and Janet Karnes had discretion to decide when that was. Putting aside the store hours, Plaintiffs also spent substantial amounts of time cleaning and maintaining the park, although their precise work schedules are unclear. After careful review of the deposition testimony of each employer and each employee, the Court finds it at least possible that the Karnes were not paid the minimum wage. However, Defendants present enough genuine issues of material fact to defeat Plaintiffs' Motion for Summary Judgment on this issue.

Plaintiffs ask the Court to accept for the purposes of this analysis that they worked eight hours per day, seven days a week, during the July of 2013, the month that they received their largest bonus. They next ask the Court to divide their income during that month by the number of hours worked, and to use that quotient, which falls below the minimum wage, to infer an FLSA violation. After careful consideration of the record, the Court cannot make that inference. For one thing, Fred Karnes testified that after 2011 he generally took a day off every week. For another

18

thing, it seems probable that hours worked in July, part of the busy season, were not reflective of a normal month for the Karnes. And even if the park was open eight hours a day, seven days a week, it does not necessarily follow that both or one of the Plaintiffs worked all of those hours. The record is undisputed that other workers filled in for Plaintiffs from time to time. Finally, the Karnes received in every month other sorts of compensation, including living quarters, phone service, internet access, and fuel reimbursements. The record does not establish the total value of these non-salary, non-bonus forms of compensation. Altogether, the Court's inability to determine from the record both the hours worked and compensation received by Plaintiffs is fatal to its attempt to calculate whether an FLSA violation occurred.

The Court is attentive to the fact that it is the Defendants, not the Plaintiffs, who had the duty to record work hours under the FLSA, and that Defendants cannot mount a defense based on a lack of records that they were obligated to maintain. See *Wirtz v. First State Abstract & Ins. Co.*, 362 F.2d 83, (8th Cir. 1966). When an employer is found to have improperly compensated an employee and has kept inadequate records on the matter, the employee must only produce sufficient evidence to show the amount of work they were not compensated for as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Co.*, 328 U.S. 680, 698-88 (1946); *Martin v. Tony and Susan Alamo Found.*, 952 F.2d 1050, 1051 (8th Cir. 1992). However, in this case, because the Court considers the facts of how many hours Plaintiffs worked and how much they were compensated to be in genuine dispute, it cannot make a reasonable inference as to whether or by how much Plaintiffs' hourly rate of pay fell below the federal or state minimum wage. At this point, such a determination would be little more than a guess. Consequently, it cannot issue summary judgment for Plaintiffs on this issue. At trial, it will be the task of a factfinder to sort through the genuine issues of material fact present in the record on this issue and to determine with

19

as much precision as possible the number of hours worked by the Karnes and the amount of their compensation.

### b. Overtime Provisions

Under the FLSA, no employer shall employ an employee for more than forty hours in a workweek without paying them at least one and one-half times their regular compensation for the time worked in excess of forty hours a week. 29 U.S.C. § 207; RSMo. § 290.527. It is the employer's responsibility, not the employee's, to maintain the employment records that would allow the Court to determine the number of hours an employee worked in a week and the compensation an employee received. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Plaintiffs move for summary judgment on violations of the FLSA and MWHL, claiming that the undisputed record shows that Defendants did not pay overtime to Plaintiffs for hours worked in excess of forty hours in a week. Defendants argue there is a genuine issue of material fact that precludes summary judgment because it is disputed whether Plaintiffs worked in excess of forty hours a week.

For an overtime wage claim to lie under the FLSA and MWHL, Plaintiffs must have worked in excess of forty hours a week. For reasons identical to those recognized *supra*, the Court considers there to be a multitude of genuine issues of material fact concerning how many hours Plaintiffs worked in any given week.  Consequently, it will not issue summary judgment for Plaintiffs on this issue. At trial, it will be the task of a factfinder to resolve the genuine issues of material fact and to determine whether and when Plaintiffs worked in excess of forty hours a week and were not given additional compensation as required under the overtime wage provisions of the FLSA and MWHL.

### III. Willfulness of Alleged Violations

Under the FLSA and MWHL, the statute of limitations for minimum wage or overtime violations is two years, unless the violation is willful, in which case it is three years. 29 U.S.C. § 255; See also *McLaughlin v. Richmond Shoe Co.*, 486 U.S. 128, 133 (1988). To prove a willful violation, Plaintiffs must establish that Defendants knew of or showed reckless disregard toward the matter of whether its conduct violated the FLSA. *Id.* Plaintiffs move for summary judgment on the issue of whether Defendants' violations were willful, claiming there is no genuine issue of material fact on the issue. To support this argument, Plaintiffs cite to deposition testimony establishing that Daniel Kucsik was aware of and understood the FLSA's overtime and minimum wage provisions.

Plaintiffs' demonstration that Daniel Kucsik had abstract knowledge of the FLSA's minimum wage and overtime policies is legally insufficient to establish the lack of a genuine issue of material fact on the issue of willfulness. Plaintiff's burden on this issue is to establish the lack of a genuine issue of material fact not only on the question of whether Defendants knew of the FLSA but also on the question of whether they (1) knew that they themselves had violated it; or (2) recklessly disregarded that possibility. The Court finds that a genuine issue of material fact still exists on this issue and will therefore deny Plaintiffs' Motion for Summary Judgment as to willfulness.

### IIII. FLSA Exemptions

Plaintiffs request summary judgment on the issue of whether two exemptions—the Bona Fide Executive Exemption and the Recreational and Amusement Exemption—protect Defendants from FLSA and MWHL liability in this case. Exemptions under the FLSA are meant to be construed narrowly, against the employer asserting them, and are limited to cases that "plainly and unmistakably" fall within their terms. *Arnold v. Kanowsky, Inc.*, 361 U.S. 388, 392 (1960);

*Williams v. U.S. Dep't of Labor*, 697 F.2d 842, 844 (8th Cir. 1983). The employer bears the burden of proof to establish that the exemption applies. *Fast v. Applebee's Intern, Inc.*, 638 F.3d 872, 882 (8th Cir. 2011). The Court will address the two exemptions in turn.

### a. Bona Fide Executive Exemption

Under the FLSA, employers need not pay overtime or minimum wage to personnel employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1). In order for a person to qualify as a bona fide executive, they must be compensated $455.00 or more per week on a salary basis, excluding the value of lodging and the use of other facilities. 29 C.F.R. § 541.100. The undisputed record shows that Fred and Janet Karnes' salary at no point exceeded $450.00 per week. As such, Plaintiffs cannot fall under this exemption, and consequently the Court will enter summary judgment in favor of Plaintiffs on this issue.

### b. Recreational and Amusement Exemption

Plaintiffs moves for summary judgment on the issue of whether they are exempted from the protections of the FLSA and MWHL, claiming that the RV Park is not a recreational or amusement establishment as a matter of law. Defendants claim that Plaintiffs have failed to establish that the RV Park is not a recreational or amusement establishment as a matter of law. Under 29 U.S.C. § 213(a)(3), the FLSA shall not apply to recreational or amusement establishments whose average receipts for any six months of the preceding calendar year were not more than one-third of its average receipts for the other six months of the year. An amusement or recreational facility is a facility that is frequented by the public for amusement or recreation. 29 C.F.R. § 779.385.

Plaintiffs claim that the RV Park is not a recreational facility because although it may have ancillary recreational facilities like a pool and a fishing pond, approximately 95% of the park's

business comes from RV campground site rentals, with the remaining business coming from store and propane sales. Upon its own review of the record, the Court finds that between 85% and 95% of the park's business comes from campsite rentals and that the park does maintain a free-to-use pool, game room, and fishing pond for customers.

In considering whether a business that generates almost all of its business from renting RV campsites is a recreational establishment under the FLSA, the Court will take into account the opinions of other courts that have considered the same or an analogous question. In *Mann v. Falk*, the Eleventh Circuit affirmed a district court's finding that an RV Park, Adelaide Shores RV Resort, that derived 92% of its income from site rentals, was not a recreational establishment. 523 Fed.Appx. 549, 553 (11th Cir. 2013) (affirming *Mann v Falk*, 2012 WL 4896726 (S.D. Fla. 2012)). The Court reasoned that although most of Adelaide Shore's customers undoubtedly visited for recreation, that did not necessarily transform the park into a recreational facility. *Id.* An establishment must do more than be a place where people go to recreate—it must be in the business of providing recreational or amusement activities itself. *Id.* The Court likened Adelaide Shores to a resort hotel, another establishment that does not qualify for the recreational establishment exemption, because both establishments mainly derived their income from selling the temporary use of their premises, not from directly providing customers with amusement or recreation. *Id.* Because Adelaide's principal activity and main source of income was providing RV lots to customers, it did not qualify for the exemption. *Id.* at 553-54.

In *Chao v. Double JJ Resort Ranch*, the Sixth Circuit considered the case of Double JJ Resort Ranch, a western-themed resort hotel that provided a mix of recreational facilities, lodging, and dining options. 375 F.3d 393, 397-98 (6th Cir. 2004). The Court found that although Double JJ did provide some recreational activities, it did not fit under the exemption because its "principal

activity" was providing lodging and food. *Id.* The Court drew a distinction between selling recreational opportunities as a primary activity and offering those opportunities them as a lure, meant to attract customers to visit and take advantage of its lodging and dining. *Id.* Determinative in its analysis was its finding that the hotel's "primary purpose is to sell foods and rent beds; the recreational activities are just a carrot enticing people to make the trip." *Id.* at 398.

Turning to the instant case, the Court is persuaded after review of the undisputed record that the RV Park does not fit into the recreational and amusement exemption as a matter of law. Happy Trails RV Park is much more easily likened to the resort hotel in *Chao*, where the potential for recreation is an enticement to pay for access to the business premise, than it is likened to the commonly-cited establishments that indisputably fall under the exemption. *Liebesman v. Competitor Group, Inc.*, 2015 WL 2195093, at *2 (E.D. Mo. 2015) (citing *Brennan v. Texas City Dike & Marina, Inc.*, 492 F.2d 1115, 1118 (5th Cir. 1974)) (these establishments include amusement parks, carnivals, circuses, sports stadiums, and facilities for horse betting, sport boating, or sport fishing). The distinction between those commonly-cited establishments—who in every case will principally derive their income directly from the provision of entertainment or amusement—and Happy Trails RV Park is obvious. The RV Park derives at least 85% of its business from the rental of long-term and short-term RV campsites, a business identical to Adelaide Shore's in *Mann* and analogous to the resort hotel's in *Chao*. Outside of these lot rentals, the Park collects money from the camp store and propane sales, both decidedly non-recreational sources of income. As far as recreational facilities, the RV Park offers only a free-to-use pool, game room, and fishing pond. The District Court in *Mann* rejected the notion that the presence of an ancillary pool at an establishment transforms the establishment into a recreational facility, and the Court will reject any similar notion here. *Mann*, 2012 WL 4896726, at *5. To hold otherwise

24

would be to allow any roadside hotel with a pool to consider itself a recreational establishment and thereby exempt from the FLSA, a clear absurdity.

The Court will also consider the U.S. Department of Labor's Guidance on this issue. Administrative guidance is not binding on this Court, except to the extent that it is validly reasoned and persuasive in its own right. See *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The DOL's Field Operations Handbook § 25j15(b) suggests that campsites and campgrounds should be exempt when they are maintained as a "functional amusement or recreational unit", meaning that they provides activities such as swimming, volleyball, bonfires, or the like. However, if the campsite merely provides space that the public uses for a night or two while in transit, it should not be considered an exempt establishment.

In the instant case, the RV Park provided services for both short- and long-term customers. However, upon review of the record, the Court finds that most of the park's clientele stayed for a short period of time, as evidenced by the small number of monthly rentals recorded in the Plaintiffs' bonus calculations. This lends itself to the conclusion that the park functioned more as a stop for RV owners in transit than as their destination. And although the RV Park did provide a pool, a game room, and a fishing pond, the Court is skeptical that these somewhat meager facilities, standing alone, transform the RV Park into a functional recreational unit. Therefore, to the extent that the Court finds the DOL Field Operations Handbook persuasive, it considers the guidance as weighing against granting Defendant this exception.

After carefully considering the record in this case, the relevant case law, and the Department of Labor's guidance, the Court is persuaded that an establishment whose principal activity is renting RV lots to customers both for long and short-term visits does not "plainly and unmistakably" fall within the terms of the recreational and amusement establishment exemption

as a matter of law. *Arnold*, 361 U.S., at 392. Consequently, the Court will grant summary judgment to Plaintiffs on this issue and hold that the Happy Trails RV Park is not a recreational and amusement establishment under 29 U.S.C. § 213(a)(3).

## CONCLUSION

Foe the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment (Doc. 111) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The Court hereby **GRANTS** summary judgment to Plaintiffs on the issues of whether Plaintiffs Fred Karnes and Janet Karnes were employees of Defendants Daniel Kucsik, Carol Kucsik, and Happy Trails Park, LLC under the FLSA and MWHL and whether any exemptions to the FLSA apply. The Court **DENIES** summary judgment to Plaintiffs on the issue of whether Defendants are liable to Plaintiffs under the FLSA and MWHL and whether Defendants' alleged violations of the FLSA and MWHL were willful.

**IT IS SO ORDERED**.

DATED: January 8, 2019

         _/s/ Douglas Harpool_____
         **DOUGLAS HARPOOL**
         **UNITED STATES DISTRICT JUDGE**